**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>ABRY N. GARFOOT and<br>KRISTEN S. GARFOOT,<br><br>Debtors. | Bankruptcy Case No. 25-17910 TBM<br>Chapter 11 (Subchapter V) |

# OPINION AND ORDER ON CHAPTER 11 (SUBCHAPTER V) ELIGIBILITY

## I. Introduction.

In 2019, Congress enacted the Small Business Reorganization Act of 2019 (the "SBRA")[1] in an effort to streamline the reorganization and rehabilitation process for small business debtors in cases under Chapter 11 of the Bankruptcy Code.[2] The SBRA (commonly referred to as "Subchapter V"), offers potential advantages to small business debtors. But relief under Subchapter V is not available to every debtor. Only those debtors who qualify as "small business debtors" are eligible to proceed under Subchapter V. Pursuant to 11 U.S.C. § 101(51D), a "small business debtor" is

> a person engaged in commercial or business activities . . . that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,424,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor . . .

In this contested matter, the United States Trustee ("UST") challenges the eligibility of the Debtors, Abry N. Garfoot (individually, "Mr. Garfoot") and Kristen S. Garfoot (individually, "Ms. Garfoot," and together with Mr. Garfoot, the "Debtors"), to proceed under Subchapter V. Specifically, the UST contends that, immediately preceding their bankruptcy filing, the Debtors were not sufficiently "engaged in commercial or business activities" related to their now-defunct business, Foot Delivery, Inc. ("Foot Delivery"), to qualify as Subchapter V debtors and thus contests their

---

1 Pub L. No. 116-54, 133 Stat. 1079 (mainly codified at 11 U.S.C. §§ 1181-1195).

2 All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

Subchapter V election on the ground that they are ineligible to seek relief under the provisions of Subchapter V. The Debtors disagreed and responded in opposition.

The Court held an evidentiary hearing on the issue of eligibility on June 12, 2026. Having considered the evidence, including the stipulated facts, testimony, and exhibits presented at the evidentiary hearing, as well as the arguments of both parties, the Court determines that the Debtors are eligible to proceed in Subchapter V.

## II. <u>Jurisdiction and Venue</u>.

This Court has jurisdiction to enter final judgment on the eligibility issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334. Eligibility for relief under Chapter 11 (Subchapter V) is a core matter under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Neither party contested the Court's jurisdiction to hear or decide this contested matter.

## III. <u>Procedural Background</u>.

### A. <u>The Bankruptcy Filing and Subchapter V Election</u>.

The Debtors filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code (Ex. A, the "Petition") on December 2, 2025 (the "Petition Date"). In their Petition, the Debtors stated in Section 7 that they were filing under "Chapter 11," and in Section 13 stated:

> I am filing under Chapter 11, I am small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

The Court refers to the Debtors' decision to proceed under Subchapter V of Chapter 11 as the "Subchapter V Election."

### B. <u>The Eligibility Objection and Response</u>.

The UST filed the "Objection to Debtors' Designation as Debtors Under 11 U.S.C. § 1182 and Election to Proceed Under Subchapter V" (Docket No. 49, the "Eligibility Objection") on February 5, 2026. Therein, the UST asserted that the Debtors' employment did not constitute "commercial or business activities" for purposes of Subchapter V eligibility and further that the Debtors, on or immediately prior to the Petition Date, were not "engaged in" commercial or business activities related to Foot Delivery, the business from which most of their liabilities arose. On February 26, 2026, the Debtors filed the Response to the Eligibility Objection (Docket No. 57, the "Response"), contesting the UST's position and arguing that the Debtors' Subchapter V election was proper.

## C. **The Hearings.**

The Court conducted a preliminary non-evidentiary hearing on the Eligibility Objection and Response on April 2, 2026. At the hearing, the UST and the Debtors reported that they had narrowed the issues for determination, but requested that the Court hold an evidentiary hearing to determine the disputed issues of fact that remained. Accordingly, the Court set the contested issue of the Eligibility Objection and Response for a trial on June 12, 2026. Additionally, the Court set pre-trial deadlines for the exchange of exhibits as well as filing of witness and exhibit lists, stipulations of facts and exhibits, and legal briefs. (Docket No. 70.)

Thereafter, the parties submitted their "Stipulation of Facts Regarding the United States Trustee's Objection to Debtors' Designation as Debtors Under 11 U.S.C. § 1182 and Election to Proceed Under Subchapter V and the Debtors' Response" (Docket No. 79, the "Stipulation"). Therein, the parties included an agreed statement of background and procedural history as well as a set of stipulated facts (the "Stipulated Facts"), numbered individually as 10-40. (Docket No. 79 at 2-5, the "Stipulated Facts".) In advance of the evidentiary hearing, the Debtors and the UST filed legal briefs on the Subchapter V Election issues. (Docket Nos. 81 and 82, respectively.) At the June 12, 2026 evidentiary hearing, the Court admitted Debtors' Exhibits 1-10; UST's exhibits A-F, K and L; and a portion of UST's Exhibit P. (Docket No. 84.) Both Mr. and Ms. Garfoot testified.

After the conclusion of the evidence, the UST and the Debtors presented legal arguments. The Court took the dispute over the Subchapter V Election under advisement. In the interim since the evidentiary hearing, the Court has reviewed all the admitted evidence, including the Stipulated Facts and exhibits, considered the testimony, and evaluated the legal issues. The Subchapter V eligibility issues are now ripe for decision.

## IV. **Factual Findings.**

Based upon the Stipulated Facts, the admitted exhibits, and the trial testimony, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

## A. **The Garfoots and Foot Delivery's Pre-Petition Operations and Activities.**

The Debtors formed Foot Delivery on April 23, 2021. (Docket No. 79 ¶ 10.) Each of the Debtors owned a 50-percent share of the business. (Docket No. 79 ¶ 12.)

Foot Delivery's assets were acquired with a Small Business Administration loan issued by South State Bank. (Docket No. 79 ¶ 10.) The Debtors personally guaranteed such loan. (Docket No. 79 ¶ 10.) Foot Delivery began operating on October 9, 2021, operating as a contracted FedEx ground customer. In that role, Foot Delivery was responsible for delivering and picking up packages from residential and business locations within assigned zip codes. (Docket No. 79 ¶ 13.)

By January 2025, Foot Delivery had about 30 employees. Mr. Garfoot was responsible for all aspects of Foot Delivery's operations, including ensuring that all trucks were dispatched daily, coordinating with managers on routes when drivers failed to show up, making payroll, and ensuring compliance with all State of Colorado employer requirements. (Docket No. 79 ¶ 14.) This included working with ADP to provide W-2s to employees.

Ms. Garfoot was not very involved in the day-to-day operations of Foot Delivery; however, she occasionally assisted Mr. Garfoot with "back office" work, including scheduling interviews with potential employees of Foot Delivery and mailing documents. Ms. Garfoot did not process payroll, but was trained in how to do so. Once, in the early days of Foot Delivery's operations, Ms. Garfoot assisted with creating a spreadsheet to track business expenses. (Docket No. 79 ¶ 15.) She viewed her role as that of a "silent partner." Indeed, Ms. Garfoot could not say whether she was an officer of Foot Delivery.

In January 2025, FedEx notified Foot Delivery that it would be terminating its contract with the company, effective March 28, 2025. As a result, Foot Delivery ceased operations on March 28, 2025. (Docket No. 79 ¶ 16.) The company collected its last receivable in April 2025. (Docket No. 79 ¶ 17.)

When it ceased operations, Foot Delivery's assets consisted of 28 vehicles, iPads, scanners, cameras, and a bank account. (Docket No. 79 ¶ 18.) Between May and June 2025, Mr. Garfoot sold Foot Delivery's iPads to other FedEx contractors and returned Foot Delivery's leased scanners and cameras to the respective lessors. (Docket No. 79 ¶¶ 19-20.) In July 2025, the Debtors, together, delivered seven of Foot Delivery's trucks to an auctioneer at the request of South State Bank to be liquidated. (Docket No. 79 ¶ 21; Ex. 8.) Mr. Garfoot engaged in all communications with South Street Bank and the auctioneer. Mrs. Garfoot was not involved. Mr. Garfoot also caused Foot Delivery to sell its remaining vehicles to a broker, a local contractor, or on the open market, coordinating with South State Bank throughout the process to ensure the sale proceeds were applied to the South State Bank loan and that titles were released to purchasers of the vehicles. The liquidation of all vehicles was completed by approximately mid-August 2025. (Docket No. 79 ¶ 21; Exs. C and D.)

On September 1, 2025, Mr. Garfoot filed Articles of Dissolution with the Colorado Secretary of State to formally dissolve Foot Delivery. (Docket No. 79 ¶ 22; Ex. B.) On October 19, 2025, in his capacity as Foot Delivery's president, Mr. Garfoot authorized Foot Delivery's accounting firm Olson, Reyes & Saurwein LLC (the "Accountant") to e-file Foot Delivery's 2024 tax returns. (Docket No. 79 ¶ 23; Ex. 10.) The accounting firm was paid for preparing the 2024 tax returns with funds remaining in Foot Delivery's bank account on October 20, 2025. (Docket No. 79 ¶ 23; Ex. 7.)

Foot Delivery continued to make payments to its creditors out of Foot Delivery's bank account until October 22, 2025. (Docket No. 79 ¶ 24.) After that time, the only

activity occurring in Foot Delivery's bank account was a recurring monthly auto-debit of $77.25 paid to Intuit for a QuickBooks subscription, which auto-debit remained in effect at least through the end of February 2026. (Docket No. 79 ¶ 25; Ex. 1.) Such subscription was required to store and maintain Foot Delivery's business records, which records were needed in order to prepare Foot Delivery's 2025 tax returns and to provide the information required to generate W-2s for Foot Delivery's former employees. (Docket No. 79 ¶¶ 25-26.)

Although a part-owner of Foot Delivery, Ms. Garfoot was not personally involved in maintaining the QuickBooks subscription, in generating or providing W-2s to Foot Delivery's former employees, or in preparing Food Delivery's tax returns. She also was not involved in the filing of the Articles of Dissolution. Her primary occupation is teaching. Indeed, she has been employed as a high school science teacher at Kent Denver for the past fifteen years. She earns $85,000 per year. Pre-petition, Ms. Garfoot also worked for a company called Rodan + Fields, but she was no longer working for that company on the Petition Date. (Docket No. 79 ¶ 28.)

In September 2025, Mr. Garfoot began working as a sales representative for Ascend Imaging, and has worked there since. Mr. Garfoot earns an annual salary of $110,000 as a W-2 employee. As a sales representative, Mr. Garfoot is responsible for selling MRI systems, CT systems, and X-ray-related systems as an authorized reseller for Philips Medical. (Docket No. 79 ¶ 27.)

Even after taking on new employment, Mr. Garfoot continued to perform some wind down work[3] for Foot Delivery. Mr. Garfoot communicated with South State Bank via telephone three times in October 2025 and once in November 2025. The purpose of those phone calls was for South State Bank to gather information regarding the timing of the Debtors' imminent bankruptcy filing. (Docket No. 79 ¶ 29.)

## B. The Bankruptcy Filings and Foot Delivery's Post-Petition Activities.

The Debtors filed their Chapter 11 Bankruptcy case on December 2, 2025. (Docket No. 79 ¶ 30.) On Schedule A/B, the Debtors list a 100% ownership interest in Foot Delivery, noting that the "entity is dissolved and out of business" and identifying the value of such entity as $0.00. On Schedules D and E/F, the Debtors list noncontingent liquidated secured and unsecured debts totaling $2,050,360.78. Of that amount, at least $1,192,162.40 arose from the Debtors' operation of Foot Delivery. (Docket No. 79 ¶ 31.) Thus, 50% or more of the Debtors' debts arose from their operation of Foot Delivery. None of the Debtors' debts arose from their employment with Ascend Imaging, Kent Denver School, or Rodan + Fields. (Docket No. 79 ¶ 32.)

[3] The Court uses the phrase "wind down work" when referring to activities undertaken in relation to Foot Delivery after the filing of Articles of Dissolution for Foot Delivery. *See In re Ikalowych*, 629 B.R. 261, 271 (Bankr. D. Colo. 2021) (referring to "Wind Down Work"). Some legal sources use the phrase "wind up work" in a synonymous fashion. The Court concludes that "wind down work" is a better and more descriptive phrase in the context of Subchapter V eligibility disputes.

In the bankruptcy case, the Section 341 meeting of creditors was held on January 7, 2026. (Docket No. 14.) Thereafter, Debtors' counsel was contacted by counsel for South State Bank, who requested documentation regarding the liquidation of Foot Delivery's iPads in mid-2025. (Docket No. 79 ¶ 36.)

Post-bankruptcy, Mr. Garfoot continued to engage in wind down work for Foot Delivery. The Debtors maintained Foot Delivery's bank account with Stearns Bank. As of the Petition Date, the account held $637.64. (Ex. A at 11.) Both before and after the Petition Date, the bank account was used to pay Intuit so as to maintain Foot Delivery's business records on QuickBooks. (Ex. 1.)

On March 2, 2026, the Debtors filed an application to employ the Accountant to assist the Debtors with preparing their personal 2025 tax returns. (Docket No. 79 ¶ 37.) On behalf of Foot Delivery, Mr. Garfoot engaged the Accountant during approximately March or April 2026. On April 10, 2026, Mr. Garfoot emailed the Accountant to inquire about preparation of Foot Delivery's 2025 tax returns and how much the tax preparation services would cost. (Docket No. 79 ¶ 38; Ex. 4.) On April 14, 2026, the Accountant obtained an extension of time for Foot Delivery to file its 2025 tax returns. (Docket No. 79 ¶ 39.) Mr. Garfoot anticipates further work to finalize Foot Delivery's 2025 tax return.

Mr. Garfoot also kept up some other activities related to the wind down of Foot Delivery. Not long after the Petition Date, Mr. Garfoot requested that Foot Delivery's former payroll provider, ADP, prepare W-2s for Foot Delivery's former employees. In January 2026, Mr. Garfoot received copies of W-2s from ADP. (Docket No. 79 ¶ 33.) Thereafter, Mr. Garfoot communicated with Foot Delivery's former employees in order to ensure he had the correct addresses to send the employees' W-2s to them. (Docket No. 79 ¶ 34-35.) And, between January 24 and February 24, 2026, Mr. Garfoot, in his capacity as President of Foot Delivery, sent at least 10 e-mails to former employees of Foot Delivery along with W-2s. During the same time period, Mr. Garfoot also sent approximately eighteen letters and hard-copy of W-2s to Foot Delivery's former employees. The Debtors incurred and paid costs for envelopes and postage.

Post-petition, the Debtors continued to store Foot Delivery's business records. They anticipate assisting Foot Delivery's Accountant in the preparation and filing of Foot Delivery's 2025 tax returns, which returns are separate and distinct tax returns from the Debtors' individual returns. (Docket No. 79 ¶ 40.) It is unclear at this time what precise involvement in finalizing Foot Delivery's tax returns each of the Debtors will have. The Debtors have no intention of resuming Foot Delivery's operations, of collecting any of its receivables, or of paying any of its creditors post-petition (other than through their plan of reorganization filed in their personal bankruptcy case).[4]

---

[4] The Debtors timely filed a "Plan of Reorganization Dated March 2, 2026 for Small Business Under Chapter 11, Subchapter V" (Docket No. 58, the "Plan") on March 2, 2026. However, at a non-evidentiary hearing held April 2, 2026, on the Eligibility Objection and Response they made an oral motion to hold in abeyance all confirmation-related deadlines pending a determination regarding their eligibility to be Subchapter V debtors, and the Court granted the oral motion. (Docket No. 70). As such, proceedings related to confirmation of the Plan are presently in abeyance.

## V. Legal Analysis.

### A. Statutory Framework for Subchapter V Eligibility.

As it must, the Court's eligibility analysis starts with the text of the applicable statute. Section 1182 defines the term "debtor" in Subchapter V cases to mean "a small business debtor." Section 101(51D), in turn, provides, in relevant part:

> The term "small business debtor"—
>
> (A) . . . means a person *engaged in commercial or business activities* . . . that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,424,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor . . . .

(Emphasis added.) The term "person" includes individuals. 11 U.S.C. § 101(41).

So, the foregoing provisions govern the issue of whether the Debtors qualify to be Subchapter V debtors and, together, contain four discrete requirements for Subchapter V eligibility. Changing the order just slightly for ease of legal analysis, the mandatory elements are:

(1) The Debtors must be "person[s]";

(2) The Debtors' aggregate debt as of the Petition Date must not exceed $3,424,000, excluding debts owed to 1 or more affiliates or insiders;

(3) The Debtors must be "engaged in commercial or business activities"; and

(4) 50% or more of the Debtors' debt must have arisen from "the commercial or business activities of the Debtor[s]."

11 U.S.C. §§ 1182(1), 101(51D), and 101(41). The Debtors bear the burden to prove their eligibility to proceed under Subchapter V. *In re Ikalowych*, 629 B.R. 261, 275 (Bankr. D. Colo. 2021).

In this case, there is no dispute that the Debtors have met the first, second, and fourth elements — that is, the parties agree that: the Debtors are persons; their aggregate debt of the Petition Date does not exceed $3,424,000; and 50% or more of their debt arose from the commercial or business activities of the Debtors in relation to Foot Delivery. However, the UST challenges the Debtors' contention that they meet the third element, arguing that the Debtors' activities just prior to, on, and immediately after

the Petition Date do not establish that they "engaged in commercial or business activities" in relation to Foot Delivery.

### 1. **"Commercial or Business Activities" Within the Meaning of Section 101(51A).**

As this Court held in *Ikalowych*, the phrase "commercial or business activities" is exceedingly broad. 629 B.R. at 276. The term "commercial or business activities" means "any private sector actions related to buying, selling, financing, or using goods, property, or services, undertaken for the purpose of earning income (including by establishing, managing, or operating an incorporated or unincorporated entity to do so)." *See id.* (construing prior version of Section 1182(1)(A)). Like the prior version of Section 1182(1)(A) discussed in *Ikalowych*, the text of Section 101(51D) provides support for the contention that the phrase "commercial or business activities" should be construed broadly. *Id.* Section 101(51D) contains a parenthetical which excludes from eligibility "a person whose primary activity is the business of owning single asset real estate." *See id*. The Court derives from that parenthetical at least two lessons: (1) Qualifying "business activity" generally can include "owning" something (other than "single asset real estate") such as equity in a company; and (2) because Congress used the word "primary" as a qualifier in the parenthetical but not the main part of the text of Section 101(51D), the use of "primary" in the parenthetical suggests that "commercial or business activities" do not need to be the "primary" activities of a debtor. *See id.* It will be enough if the debtor engaged in some "commercial or business activities" provided that all the other elements of Section 101(51D) are met. *See* 629 B.R. at 276.

Per *Ikalowych*, use of the "extremely broad phrase" "commercial or business activities" without further qualifiers demonstrates the breadth of the phrase. 629 B.R. at 276 (quoting Antonin Scalia and Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (Thompson/West 2012) [hereinafter, "READING LAW"] and *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (which quotes *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)). "Commercial or business activities" include such activities as "'the acquisition, use, sale, storage and disposal of goods and services'; 'entering into employment contracts; and 'establishing corporations, partnerships, and other legal entities.'" *Ikalowych*, 629 B.R. at 279 (construing federal statutes). They can also include "sales of goods and products; leases; negotiable instruments; bank deposits and collections; funds transfers; letters of credit; bulk transfers; investment securities; secured transactions; and more." *Id.* at 280 (construing the Uniform Commercial Code).

When a debtor's business has ceased to perform its active business operations, wind down activities, such as: interacting with a business's lenders concerning the business's wind up; interfacing with a business's landlord regarding the business's wind down; helping with the physical clean up or a business's leased premises and turnover of the premises to the business's landlord; assisting in addressing payroll records for a business's former employees; addressing Form 1099 issues for a business's vendors; communicating with a business's tax accountants; interfacing with a business's bookkeeper regarding loans and regarding a final close-out of financials; working on a

business's records retention and storage (including transitioning QuickBooks files); and considering a business's intellectual property and website issues all constitute "business and commercial activities" *Id.* at 269-70, 284-85. And, to qualify as "commercial or business activities, such tasks "can be performed by either individuals or companies." *Id.* at 278.

### 2. <u>Temporal Requirements for Being "Engaged in" Business Activities Under Section 101(51A)</u>.

In *Ikalowych*, the Court determined that, in evaluating whether a debtor "engaged in" commercial or business activities sufficient to qualify for Subchapter V:

> [T]he Court must assess whether the Debtor was "engaged in commercial or business activity" as of the Petition Date, [although] focusing only on the exact nano-second the Petition was filed is a bit too narrow. For example, perhaps the Debtor did no work on the Petition Date itself. So, in considering whether the Debtor was engaged in "commercial or business activity" as of the Petition Date, the Court deems relevant the circumstances immediately preceding and subsequent to the Petition Date as well as the Debtor's conduct and intent.

*Id*. at 283. *See also In re Heart Heating & Cooling, LLC*, 2024 WL 1228370, at *7 (construing the SBRA and deciding that "[t]he plain meaning of "engaged in" means to be actively and currently involved."). Whether the Debtors were "engaged in commercial or business activity" as of the Petition Date is determined under the "totality of the circumstances." *Ikalowych*, 629 B.R. at 283 (citation omitted).

## B. <u>Analysis: The Debtors Were "Engaged in Commercial or Business Activities" Within the Meaning of Section 101(51A)</u>.

The activities performed by the Debtors in winding down the affairs of Foot Delivery satisfy the Subchapter V eligibility requirement of the Debtors being "engaged in commercial or business activity." During the period immediately preceding, on, and after the Petition Date, the Debtors: maintained Foot Delivery's bank account; provided for payment of Foot Delivery's QuickBooks subscription to Intuit; requested and reviewed W-2s for Foot Delivery's former employees; distributed approximately 28 W-2s to Foot Delivery's former employees by e-mail and standard mail; retained an Accountant for Foot Delivery; and assisted in the preparation of Foot Delivery's tax returns. The foregoing constitutes "commercial or business activities" within the meaning of Section 101(51A). And, contrary to the UST's suggestion, the Debtors have engaged in some such activities immediately preceding and subsequent to the Petition Date. Indeed, as the Debtors note, on the Petition Date, the Debtors continued to hold Foot Delivery's business records and to maintain its bank account for purposes of paying the QuickBooks subscription so that they could distribute W-2s to former

employees and engage in the work they will need to do post-petition to finalize and file the company's tax returns. Such work is required to wind down the business affairs of Foot Delivery. *See* Colo. Rev. Stat. § 7-114-105(1) (providing that a "dissolved corporation continues its corporate existence," prohibiting dissolved corporation from "carrying on any business except as is appropriate to wind up its business and affairs," and identifying some wind up activities in which a dissolved corporation might need to engage to wind up its corporate existence). *See also*, *e.g.*, IRS Pub. 5447-B (9-2020) (noting that dissolved corporations must: file tax returns and for the calendar year in which a corporation paid final wage payments must make final federal tax deposits; file Form 941, Employer's Quarterly Federal Tax Return (or Form 944, Employer's Annual Federal Tax Return); file Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return; provide Forms W-2, Wage and Tax Statements, to employees; file Form W-3, Transmittal of Income and Tax Statements; and transmit Copy A to the Social Security Administration things); "Closing a Business" at https://www.irs.gov/businesses/small-businesses-self-employed/closing-a-business (similar). The Debtors' post-petition wind down activities stand in strong contrast to the lack of activities conducted by the debtor in regard to his dissolved business in *In re Tombul*, 2026 WL 1096475 (Bankr. E.D. Tenn. Apr. 22, 2026), a case cited by the UST. In *Tombul*, the debtor had completed all litigation related to his guarantee of a defaulted lease for his defunct business prior to the petition date, and, it seems, the debtor presented no evidence of wind down activities being undertaken on or near the petition date. In this case, the Debtors' wind down activities, though not extensive, are sufficiently related to their business and occurred close enough in time to the Petition Date (that is, immediately before, on, and after the Petition Date) that the Court determines the Debtors were "engaged in commercial or business activities" in satisfaction of the Subchapter V eligibility requirements.

## VI. Conclusion and Order.

Because the Debtors' activities fall within the definition set forth in Section 101(51D), the Court concludes that the Debtors have met their obligation to establish their eligibility to be small business debtors under Section 1182 and Section 101(51A). Accordingly, the Court hereby

ORDERS that the Eligibility Objection is OVERRULED. The Court will by separate order set a hearing on confirmation of the Debtors' Plan.

DATED this 4th of September, 2026.

BY THE COURT:

Thomas B. McNamara
United States Bankruptcy Judge